**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EILEEN A. BOWER,** | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **2:11-cv-931** |
| **LAWRENCE COUNTY CHILDREN AND** | ) |
| **YOUTH SERVICES, EVA LIGHTEL** | ) |
| *Lawrence County Children and Youth Services* | ) |
| *Caseworker, AND* **JAMESON HEALTH** | ) |
| **SYSTEMS**, | ) |
| **Defendants.** | ) |
| | ) |

## <u>MEMORANDUM OPINION AND ORDER OF COURT</u>

Pending before the Court are the MOTION FOR SUMMARY JUDGMENT (ECF No. 41) filed by Defendant Jameson Health Systems ("Jameson" or "Hospital") and the MOTION FOR SUMMARY JUDGMENT (ECF No. 46) filed by Defendants Lawrence County Children and Youth Services ("LCCYS") and caseworker Eva Lightel ("Lightel"), with briefs in support. Plaintiff Eileen Bower ("Bower") has filed responses in opposition to the motions and Defendants have filed reply briefs. The parties have also thoroughly developed their respective positions as to the Concise Statements of Material Facts ("CSMF") and have submitted voluminous appendices. The motions are ripe for disposition.

<u>Factual and Procedural Background</u>

This case presents difficult questions regarding the balance between a mother's right to keep her newborn baby and the duties of the government, an individual case worker, and a hospital to report and address suspected child abuse. The material facts are essentially undisputed. Plaintiff Bower contends that Defendants wrongfully deprived her of custody of her

newborn baby ("Baby Brandon") for seventy-five (75) days due to a "false positive" drug test caused by having eaten poppy seeds.

In July 2009, Bower was a twenty years old resident of Lawrence County, Pennsylvania. On July 12, 2009 at approximately 7:00 p.m., Bower hosted a barbecue dinner at her new home. As part of the meal, Bower consumed linguini salad with McCormick Foods Supreme Pasta salad dressing which contained poppy seeds. Bower used two bottles of the salad dressing with one pound of pasta. Bower Deposition at 127. Shortly after dinner, Bower went into labor. During her pregnancy, Bower had received necessary and appropriate prenatal care and had passed every drug screen that had been administered, including a drug test taken approximately three weeks earlier, on June 22, 2009. At 9:20 p.m., Bower was admitted to Jameson for the birth of her second child.

At that time, Jameson had a written drug testing policy (the "Policy") by which all obstetrical patients were administered a urine drug screen in order to identify newborns who may demonstrate symptoms of drug withdrawal and require special observation and treatment. Jameson Exhibit L. The policy had been drafted by Jan Peterson, manager of social services for Jameson. LCCYS was not involved in enacting the policy.[1] The hospital laboratory detection level for opiate metabolites is 300 nanograms/mL, which is far lower than the 2000 nanograms/mL level set by the federal government for federal workplace testing programs. Jameson's Policy further required that if a mother tested positive, a drug test be performed on the newborn's urine and meconium. The Policy required Jameson to notify its social service department whenever a maternity patient's initial drug screen was positive. In July 2009, every

---

[1] Plaintiff denies this CSMF, on the basis that Jameson and LCCYS had a "good business relationship"; and various Jameson and LCCYS personnel held meetings regarding child abuse services and in-service support. Plaintiff's suggestion that LCCYS helped to develop Jameson's "policies" mis-states the record. Debra Perretta actually testified: "I believe they were related at one time to help do our child abuse policies – ***not*** **policies – child abuse services**." Perretta Deposition at 20 (emphasis added).

initial positive drug screen result was reported by Jameson's social services staff to LCCYS.[2] Jameson Exhibit K.  In addition, positive results on the initial urine screen would be sent for a confirmatory test.

At 10:56 p.m. on July 12, 2009, Bower provided a urine sample.  She was not told that the sample would be used to conduct a drug screen.  Nobody asked Bower whether she had eaten any foods that might affect the test results.  Plaintiff's initial urine screen came back "present" for morphine.  A concentration was not listed.

Baby Brandon was born shortly after midnight on July 13, 2009.  On July 13, 2009, Jameson forwarded the urine sample to Quest Diagnostics ("Quest") for a confirmation test (without notice to Bower).

On July 14, 2009, Jameson reported the positive urine screen result to LCCYS.  The LCCYS Intake Screening Form noted that "Baby tested negative," although the results of a confirmatory meconium test would not be known for a "few weeks."[3]  LCCYS Exhibit E. The Form had a section for "Safety Threats" which noted that there was no present or impending danger.   Later that day, a social worker for Jameson advised Bower of the positive drug screen and that the result had been reported to LCCYS.  Bower testified:  "She just said that its their duties [sic] to inform [LCCYS] and that, you know, whatever happens from there, they have no control over."  Bower Deposition at 161.  Bower was distraught; she denied any substance abuse; and she tried to find out what had caused the false positive result.  A nurse asked whether she had eaten poppy seeds, and Bower researched the ingredients of the Supreme Pasta dressing on her cell phone.

---

[2] The Jameson Policy has since changed.
[3] The test results on Baby Brandon's meconium were actually received on July 17, 2013 and were "negative" for drugs.  Bower Exhibit X.  It is not clear when the test results were provided to LCCYS.

LCCYS caseworker Lightel became involved on July 14, 2009. Lightel's notes reflect a conversation with Barb Smolnik, a social worker at Jameson, who informed Lightel that there was "no explanation for the Opiates" and advised that the test did not appear to be a "false positive."[4] LCCYS Exhibit F.

In July 2009, the policy of LCCYS was to seek an ex parte Order granting LCCYS custody of any newborn whose mother had tested positive for an illegal substance.[5] Lightel Deposition at 26-27. As Lightel testified, it was not necessary for a caseworker to perform any investigation regarding the positive test: "I have the hospital saying she tested positive and that was enough for me." *Id*. at 16. Pursuant to LCCYS policy, the positive drug screen was the only information needed for the caseworker "to get an ex parte order to take the child." *Id*. This was LCCYS policy for all intake workers at that time. *Id*. at 27. Lightel was following LCCYS policy in this case. *Id*. The Director of LCCYS is responsible for the development of the policy. Copper Deposition at 35. Various Jameson staffers were generally aware of the LCCYS policy but there is no evidence in the record that Jameson had any role in the development or implementation of the LCCYS policy.

On the morning of July 15, 2009, Lightel decided to obtain an ex parte Order to take Baby Brandon into custody. The LCCYS action was based solely on the positive urine screen as reported by phone from Jameson.[6] Prior to seeking protective custody, Lightel did not interview Bower or her family members; did not interview Bower's treating physician, Dr. Bassaly; did not attempt to obtain copies of Bower's medical records or prior drug tests; never obtained the drug

---

[4] Hospital records reflect that Bower was administered Darvocets, an opiate, on July 13, 2009 (after the urine screen).

[5] The LCCYS Policy has since changed.

[6] Lightel testified that a LCCYS manager, Frank Merlino, told her that Bower had been in the LCCYS system as a teenager. However, Merlino denied any knowledge of Bower and Defendants have disavowed the alleged information from Merlino as a basis for Lightel's decision to seek custody. Reply Brief at 4.

test on Baby Brandon; and never inspected Bower's home or investigated whether she had the necessary items to care for an infant.  No services or options were offered as an alternative to removal of the baby. In petitioning for the ex parte order of custody, Lightel alleged that Bower had tested positive for opiates and therefore Baby Brandon was without proper parental care. LCCYS contended that to allow Baby Brandon to return home with Bower would be contrary to his welfare because he had been exposed to drugs.

On July 15, 2009, Judge John W. Hodge of the Court of Common Pleas of Lawrence County issued an ex parte custody Order.  The Order stated, inter alia:  "Although no services were offered by the Lawrence County Children and Youth Agency to prevent removal of the child from the home, this level of effort was reasonable due to the emergency nature of the situation, safety considerations and circumstances of the family."  Bower Exhibit L.

After obtaining the ex parte Order, Lightel spoke again to Smolnik, who related Bower's claim that she had consumed poppy seeds shortly before she went into labor.  Lightel's notes reflect that the Hospital was "doing a confirmatory test and the lab work should be back on Thursday or Friday" (July 16 or 17).  LCCYS Exhibit F.  These phone calls with Smolnik were Lightel's only contacts with anyone from Jameson about the case.  Lightel Deposition at 17.

Later on July 15, Lightel spoke (for the first time) to Bower.  Bower told Lightel that ingesting poppy seeds may have caused the positive test and that there was "a rush" on the confirmatory drug test.  Bower had a Walmart receipt for the poppy seed salad dressing, which she showed to the nurse, her attorney, and LCCYS.  Bower also provided Lightel with information about false positive tests due to poppy seeds that had been printed out by the nursing staff.  Jameson social worker Terry Perkins informed Lightel that the hospital staff "somewhat believed" Bower's explanation.  Perkins Deposition at 34-35.  Lightel did not attempt to

investigate Bower's explanation.  Lightel told Bower that LCCYS had already obtained an ex

parte Order to take custody of Baby Brandon and that there would be a hearing the next day.

On July 15, 2009, Quest issued a report on the initial urine screen which indicated that

morphine was "present" but at such a low concentration that the reference range was "NONE

DETECTED."  LCCYS Exhibit C.  The detection limit of the Quest report was 100 ng/mL.  It is

unclear when the Quest report was provided to LCCYS, although Lightel's notes reflect that the

confirmatory test results would "come back tomorrow" (July 16).  LCCYS Exhibit F.

Bower remained in the hospital because she was distraught.  Baby Brandon also remained

in the hospital.  On July 16, 2009, a seventy-two hour hearing required by the Pennsylvania

Child Protective Services law commenced before Master Susan Papa.  Bower was present at the

hearing along with counsel, Deborah Shaw.  Bower was unwilling to accept that LCCYS was

going to take her son and put him in foster care.  Bower Deposition at 174.  Bower testified that

during a recess, the Master came into a back room and yelled at her to "buck up, get a backbone,

and stop crying."  Bower Deposition at 176-77.  Bower and her attorney then decided to waive

the hearing and it was determined that Baby Brandon would remain in the custody of LCCYS

until an adjudication hearing scheduled on the following Tuesday, July 21, 2009.

Lightel's notes on July 16 reflect that Bower continued to deny any type of drug use;

agreed to undergo a drug and alcohol evaluation; that Bower's other child, Rhiauna, appeared

healthy and clean; that Baby Brandon's father was absent and wanted by the law; and that Baby

Brandon "looked good," but was demonstrating excessive sucking and was a little cranky.  When

Bower returned to the hospital after the 72-hour hearing, Baby Brandon had already been taken

into custody by Lightel and placed in foster care.

On July 20, Lightel made a surprise visit to Bower's home.  There was a large dog in the home, which Bower placed in a bedroom prior to giving Lightel access.  There were no gates to prevent Rhiauna from accessing the stairs, but Lightel determined that it was safe for Rhiauna to stay in the home with Bower.  Lightel did not observe any visible signs of drug use.  Lightel administered a random drug screen, which Bower passed.

On July 21, 2009, an adjudication hearing was held at 1:30 p.m., at which Bower was represented by counsel.  Master Papa found that Baby Brandon should remain in LCCYS custody, stating:  "Mother tested positive for opiates at child's birth."  Exhibit J.  On July 23, 2009, Bower visited Baby Brandon at the LCCYS office.  Lightel's notes reflect that Bower "appears to love him and was good with him during the visit."  LCCYS Exhibit F.

On July 24, 2009, the Lawrence County Court of Common Pleas adopted the Master's recommendations and continued the hearing until September 28, 2009.  The Court ordered random drug testing, and noted that if Bower was fully compliant and no other issues had arisen, the case may be dismissed at that time.

On July 27, 2009 Julie Jendrysik, case manager with Lawrence County Drug and Alcohol Commission, performed a drug and alcohol evaluation of Bower.  Jendrysik determined that "no treatment is recommended at this time," although she noted that the evaluation was largely based on self-reporting from Bower.  Several days later, Jendrysik called Lisa Matteo at LCCYS to express her belief that Bower had not been truthful regarding her drug history, although Jendrysik had made no such comments to Bower.  LCCYS required Bower to go to drug treatment.

On July 30 Lightel, an Intake worker, ceased her involvement in the case.  On August 3, LCCYS assigned the case to Placement Caseworker Megan McConahy.  McConahy's first involvement with the case did not occur until August 11, 2009.  Deposition at 31.

On September 28, 2009, seventy-five (75) days[7] after he was removed, Baby Brandon was returned to Bower's physical custody following an informal adjudication/disposition hearing with Master Papa.  The Master's recommendation was adopted by Court Order of October 8, 2009.  During these 75 days, Bower was permitted one weekly hour-long visit with her son.  On two or three occasions, Bower was unable to schedule this visit because Lightel was on vacation.

On December 3, 2009, a final hearing was held in the Lawrence County Court of Common Pleas and LCCYS involvement was terminated.  The Court Summary noted that Bower had been drug tested on three separate occasions since the last court hearing and all results had been "clean."  On December 9, 2009 legal custody of Baby Brandon was returned to Bower.

This federal litigation followed.  Plaintiff filed a five-count Complaint.  On November 14, 2011 this Court issued a Memorandum Opinion which granted Defendants' Motion to Dismiss as to Counts IV and V, but denied the motion as to Counts I-III.  Count I alleges that LCCYS and Lightel violated her substantive due process rights under the Fourteenth Amendment to the United States Constitution.[8]  Count II alleges that Jameson and LCCYS conspired to violate Bower's constitutional rights.  Count III alleges negligence by Jameson, in that it failed to use reasonable care to avoid a "false positive" drug test; failed to ensure that LCCYS was apprised that the results indicated a "below the reference range"; and violated its own policy by reporting a result below the 300 nanogram/mL screening level.   Plaintiff alleges that she endured emotional turmoil and stress due to the seizure of her baby.  Plaintiff further

---

[7] During this time, Baby Brandon had been placed in three different foster homes.
[8] The Court, and the Defendants, assume that the constitutional claims are brought pursuant to 42 U.S.C. § 1983.

alleges that she lost the ability to breast-feed and bond with her infant child.  Bower challenges

both the initial decision to take Baby Brandon into custody and the length of the deprivation.


Standard of Review

Pursuant to Fed.R.Civ.P. 56(a), "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law," summary

judgment should be granted.  The threshold inquiry is whether there are any genuine factual

issues that can be properly resolved only by a finder of fact because they may reasonably be

resolved in favor of either party.  *Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A

court may grant summary judgment if the nonmoving party fails to make a factual showing

"sufficient to establish an element essential to that party's case, and on which that party will bear

the burden of proof at trial."  *Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986).  In

making this determination, the nonmoving party is entitled to all reasonable inferences.

*Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008).  A court may not make

credibility determinations or weigh the evidence in making its determination.  *Reeves v.

Sanderson Plumbing Products Inc.*, 530 U.S. 133, 150 (2000).


Discussion

Fundamental constitutional rights are implicated in this case.  "The deprivation of a

parent's custodial relationship with a child is among the most drastic actions that a state can take

against an individual's liberty interest, with profound ramifications for the integrity of the family

unit and for each member of it."  *B.S. v. Somerset County*, 704 F.3d 250, 272 (3d Cir. 2013).

When the government intrudes on the parent-child relationship, it implicates "a fundamental

liberty interest of the parent who loses custody" and risks liability for having caused such a deprivation wrongly.  *Id*.  On the other hand, the parental interest must "be balanced against the state's interest in protecting children suspected of being abused."  *Id*.  The right to familial integrity does not include a right to be free from child abuse investigations.  *Id*. at 273.

Fundamental parental rights are implicated both by the initial decision to remove a child and by the length of the resulting separation.  "While the question of what constitutes due process is necessarily rooted in the circumstances of a given case, it is axiomatic that at least some process is required when 'a state seeks to alter, terminate, or suspend a parent's right to the custody of [her] minor children.'"  *Id*. at 272 (quoting *McCurdy v. Dodd*, 352 F.3d 820, 827 (3d Cir. 2003)).  It is not sufficient that a mother's custodial rights were eventually addressed after the caseworker's investigation was concluded.  Because a constitutional deprivation occurs upon the initial removal of the child from the mother, being heard much later fails to address the harm.  *Id*.  Moreover, after a deprivation, the government must work promptly to minimize the parent-child separation.  The *B.S.* Court explained:  "it should be obvious that a hearing 40 days later is not sufficiently prompt.  The delay should ordinarily be measured in hours or days, not weeks."  *Id*. at n. 31.  The Court emphasized:  "in view of the extremely important liberty interests at stake here, due process required the County to offer Mother a chance to be promptly heard after they took Daughter from her home, regardless of whether or not state law independently imposed that obligation."  *Id*. at 273.  With that background, the Court turns to Bower's claims against each Defendant.

A.  Caseworker Eva Lightel (Count I – Substantive Due Process)

Lightel contends that she is entitled to absolute immunity from all claims.  In *B.S.*, the Court explained that the doctrine of absolute immunity may be decided as a threshold issue.  *Id.* at 261 n.22.  Child welfare workers are entitled to absolute immunity when their "function" is analogous to that of a prosecutor, such as "their actions in petitioning and in formulating and making recommendations to the state court."  *Id.* at 262.  One justification for providing immunity to caseworkers is that "they are under the supervision of the agency that employs them."  *Id.* at 263.  An agency such as LCCYS has an incentive to ensure that its employees do not violate constitutional rights because the agency itself "is not immune from suit for abuses committed by employees . . . acting pursuant to agency policy or custom."  *Id.*

Caseworkers are not absolutely immune for actions taken outside the context of a judicial proceeding, such as investigative or administrative actions.  *Id.* at 270.  A caseworker may not shield investigatory work from review merely by seeking a court order at some point.  *Id.*  On the other hand, immunity extends "for all of their actions in preparing for and prosecuting [ ] dependency proceedings."  *Id.* at 262.  To determine whether a caseworker is entitled to immunity, the Court must ascertain the underlying function served by the investigation and the role the caseworker occupied.  *Id.* at 270.  In *B.S.,* the Court concluded that the caseworker was immune for all of her conduct, including her post-removal investigation, because she gathered and evaluated the information in preparation for an upcoming judicial proceeding at which she advocated on behalf of the county.  *Id.* at 269-70.

Applying these principles to the evidentiary record in this case, it is clear that Lightel is entitled to absolute immunity for her original decision to obtain an ex parte order from the Court to take Baby Brandon into custody.  Lightel acted in accordance with LCCYS policy and her role

was analogous to that of a prosecutor.  While a somewhat closer call, the Court concludes that

Lightel is also entitled to absolute immunity for her subsequent investigatory activities.  The

function she performed was similar to that discussed in *B.S.*, namely an investigation to make a

custody recommendation in the context of ongoing legal proceedings.  The Court had ordered

that Baby Brandon be taken into custody and Lightel was gathering information for a "72 Hour"

hearing on July 16, 2009; an Adjudication Hearing scheduled for July 21; and a hearing set for

September 28, 2009.  Lightel's involvement ended on July 30, 2009, when the case was

"transferred to Placement."[9]  Lightel, similar to the caseworkers in *B.S.*, gathered information as

a necessary predicate to formulation of a recommendation to the Court in a subsequent custody

determination.  *Id.* at 269.   Thus, Lightel is entitled to absolute immunity.

In accordance with the foregoing, Lightel is entitled to summary judgment on Count I

and she will be dismissed as a party to this case.


B.  LCCYS (Count I – Substantive Due Process)

A government agency is subject to § 1983 liability for the actions of its workers which

occur pursuant to agency policy.  *Id.* at 263.  It is undisputed that in July 2009, LCCYS had a

policy, practice or custom "of seeking an ex parte Order of Court to remove a child from a

mother who had tested positive for an illegal substance based upon that test result."  LCCYS

Brief at 12-13.  LCCYS does not contest that Lightel acted pursuant to its policy, but merely

contends that its policy of taking a child into custody based solely on the positive drug test – with

no further investigation – does not "shock the conscience."  LCCYS Reply Brief at 4-5.

This Court discussed the contours of the substantive due process claim against LCCYS at

length in its November 14, 2011 Memorandum Opinion, which discussion it reaffirms and

---

[9] Placement caseworker McConahy is not a party to this case.

incorporates.  Judge David Stewart Cercone of this Court also addressed very similar issues involving the same LCCYS and Jameson policies in *Mort v. Lawrence County Children and Youth Services, et al.*, 2011 WL 3862641 (W.D. Pa. August 31, 2011).

Upon receipt of information regarding possible drug use by a new mother, the government must conduct a reasonable, individualized investigation prior to taking away her baby.  As explained in *Mort*:  "To override the parental interest the state must have some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id*. (citing *Croft v. Westmoreland County Children and Youth Services*, 103 F.3d 1123, 1126 (3d Cir. 1997).  Removal of a child from parental custody "without reasonable suspicion to believe ongoing parental custody presents a threat to the child's health or safety constitutes an arbitrary abuse of government power."  *Id*. (citing *Croft*).

In *Mort*, the Court concluded that the mother had properly pled a substantive due process violation against LCCYS.  The Court reasoned that a policy that separates a mother and a newborn child based on a single drug test, without an individualized assessment of the specific facts and circumstances, "does not supply reasonable suspicion of child endangerment or ongoing abuse."  In *Croft*, the United States Court of Appeals for the Third Circuit held that CYS violated parental substantive due process rights by removing a parent from the home based on a tip from an anonymous informant.  103 F.3d at 1126.  The Court stated:  "a state has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse."  The information available to CYS must create "an objectively reasonable suspicion of abuse justifying the degree of interference with the [parental] rights."  *Id.; Accord  Nicholson v.*

13

*Williams*, 203 F.Supp.2d 153, 237 (E.D.N.Y. 2002) ("The government must be able to show 'an objectively reasonable basis' for deciding the child is immediately threatened with harm to justify removal from the mother without prior judicial authorization.... A corollary of this rule is that the government must conduct sufficient investigation into the alleged neglect or abuse it relies upon to establish an objectively reasonable belief that the mother has neglected or abused her child.") (citing *Gottlieb v. County of Orange*, 84 F.3d 511, 516 (2d Cir. 1996)); and *Strail v. Dept. of Children, Youth and Families of State of R.I.*, 62 F.Supp.2d 519, 529 (D.R.I. 1999) ("[T]he due process clause will certainly be offended if children are taken away from their parents without sufficient investigation."); *Cf. Stanley v. Illinois*, 405 U.S. 645, 656–657 (1972) (involving parental rights of unwed father) ("Procedure by presumption is always cheaper and easier than individualized determination.  But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand.").  In *Croft*, the Court explained that the burden is on CYS to develop objective evidence prior to taking action, rather than on a parent to disprove an allegation.  A caseworker must "corroborate the information through other sources which would have reduced the chance that the informant was recklessly relating incorrect information or had purposely distorted information."  103 F.3d at 1127.

As explained in *Mort*, the LCCYS policy can result in the separation of mother and child within days of birth without any valid basis for doing so.  As illustrated by the timeline in this case, there was no need for precipitous, ex parte court action.  Baby Brandon remained in the hospital for several days, during which time LCCYS could have corroborated (or questioned) the initial urine screen result.  Indeed, the LCCYS Intake Screening Form noted that there was no

14

present or impending danger.  By taking custody of Baby Brandon without any effort to

corroborate the drug test and without talking to the parent, LCCYS policy did not provide

sufficient protection for the fundamental parental rights involved in light of the drastic nature of

the deprivation.  The LCCYS action in this case was an arbitrary use of government power

which transcended the realm of negligence and deliberate indifference.  *Accord Mort*, 2011 WL

3862641 at * 10 *(citing Miller*, 174 F.3d at 376).  Lightel stated:  "I have the hospital saying she

tested positive and that was enough for me [to get an ex parte order to take the child]."

Deposition at 16.  The removal of Baby Brandon based solely on Jameson's report of the initial

urine screen – with no individualized investigation – shocks the conscience and violates

Plaintiff's substantive due process rights.

LCCYS suggests that its liability should be limited to the initial removal of Baby

Brandon because there is no evidence of a post-removal policy.  The Court cannot agree.  The

damages suffered by Bower occurred as a direct result of the LCCYS removal policy and

continued throughout the entire period of the separation.  The *B.S.* Court explained that the post-

removal delay should be measured in "hours or days, not weeks."  704 F.3d at 272 n. 31.  In this

case, the delay lasted for two and a half <u>months</u> (75 days).  The record reflects a total lack of

evidence of drug use by Bower and a shocking lack of urgency by LCCYS to remedy the

wrongful deprivation of her parental rights which exceeds negligence or deliberate indifference.

LCCYS never developed any evidence to support a reasonable suspicion of child endangerment

or ongoing abuse by Bower.  Bower's prenatal drug test on June 22 was negative.  Baby

Brandon's initial drug test was negative.  The Quest Lab confirmation test on July 15 showed

Bower's morphine level as "none detected."  Bower repeatedly denied any drug use and

provided a plausible explanation, supported by a receipt for the poppy seed salad dressing.

Jameson staff seemed to believe Bower and provided information about how poppy seeds can cause a "false positive" test. Baby Brandon's meconium test on July 17 was negative. Bower's July 20 drug test was negative. Other random drug tests of Bower during the 75-day deprivation were also negative. The July 27 drug and alcohol evaluation of Bower determined that "no treatment is recommended at this time." Despite all of this information that negated a suspicion of child abuse, LCCYS never exhibited a sense of urgency to remedy its wrongful decision to take Baby Brandon into custody. LCCYS' efforts to facilitate weekly visits between Bower and Baby Brandon were lacking – on several occasions, no visit occurred because Lightel was on vacation and no alternatives were provided. For a two-week period, while Bower and Baby Brandon were separated, LCCYS did not even have a caseworker assigned -- Lightel was removed from the case on July 30 but her replacement, McConahy, did not become involved until August 11.[10] It was LCCYS who violated Plaintiff's fundamental rights, and thus, LCCYS had a duty to remedy that violation as quickly as possible. In *Mort*, LCCYS filed a motion to dismiss its dependency petition after six days, stating that "after further investigation, there is no evidence to support illegal drug use by the natural mother." 2011 WL 3862641 at *5. LCCYS took no such remedial action in this case, even though it never obtained any evidence of illegal drug use by Bower and the deprivation lasted for 75 days. In sum, Bower is entitled to recover damages for the entire period of time during which she was separated from Baby Brandon.

LCCYS relies on two cases for its contention that it did not violate Bower's substantive due process rights, *Mulholland v. Berks County*, 706 F.3d 227, 241 (3d Cir. 2013) and *Patterson v. Armstrong County CYS*, 141 F. Supp.2d 512 (W.D. Pa. 2001). Neither case is helpful to

---

[10] The Court is aware that the Adjudication Hearing was postponed from July 21 to September 28 by Master Papa. However, as the Court explained in *B.S.*, due process requires that a mother be offered a chance to be promptly heard, regardless of whether or not state law independently imposes that obligation. *Id*. at 273.

LCCYS.  In *Mulholland*, the United States Court of Appeals for the Third Circuit reiterated that

CYS "shocks the conscience" if it takes a child without reasonable factual support:

> [The "shocks the conscience"] standard is met if the child is removed without "an objectively reasonable suspicion of abuse," based on the information available at the time. *Croft v. Westmoreland Cnty. Children and Youth Servs.*, 103 F.3d 1123, 1126 (3d Cir. 1997). "Absent such reasonable grounds, governmental intrusions of this type are arbitrary abuses of power." *Id*. That is because "a state has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id*. Reasonable suspicion is lacking when a child welfare agency has "consciously disregarded a great risk that there had been no abuse." *Ziccardi v. City of Phila*., 288 F.3d 57, 66 (3d Cir. 2002).

706 F.3d at 241.  In *Mulholland*, the Court denied the substantive due process claim against the

county because there was no evidence of a policy, practice or custom.  By contrast, in this case,

LCCYS admits that the actions against Bower took place pursuant to its policy.  The reliance of

LCCYS on *Patterson* is also misplaced because in that case a teenager's oral and written

statement about a physical fight with her mother, accompanied by scrapes and bruises on her

body, provided an objectively reasonable basis for taking the child into custody.  No such

evidence existed in this case.  In accordance with the foregoing, the Court will deny summary

judgment to LCCYS as to Count I.

The Court will then take the logical next step and enter summary judgment in favor of

Bower and against LCCYS on Count I *sua sponte*.  In *Croft*, the United States Court of Appeals

for the Third Circuit faced this precise procedural posture – the Court had rejected the County's

substantive due process argument and the parents had not filed a cross-motion for summary

judgment.  The majority opinion remanded the case to the district court to enter "automatic

summary judgment on [the parents'] claims."  103 F.3d at 1127 n.6.[11]  The same result is

appropriate in this case.

---

[11] For unstated reasons, the concurring judge was reluctant to mandate this result.

Whether governmental conduct violates substantive due process is a matter of law for the court to decide.  *Benn v. Universal Health System, Inc.*, 371 F.3d 165, 174 (3d Cir. 2004).  The test is whether the conduct shocks the judicial conscience in a constitutional sense.  *County of Sacramento v. Lewis*, 523 U.S. 833, 847-48 (1998) ("constitutional concept of conscience shocking duplicates no traditional category of common-law fault").  Thus, this issue is not amenable to resolution by a jury.

Pursuant to Fed. R. Civ. P. 56(f)(1), after giving notice and a reasonable time to respond, a court may "grant summary judgment for a nonmovant."  LCCYS has had a full opportunity to be heard.  The substantive due process claim has been the subject of extensive briefing, not only at summary judgment, but also at the motion to dismiss stage.  The factual and legal issues necessary to resolve the substantive due process claim have been thoroughly developed and there are no material questions of fact in this case.  The LCCYS policy, causation, and length of the parent-child separation are all undisputed.  Bower is entitled to summary judgment on the substantive due process claim even if the record is viewed in the light most favorable to LCCYS.  Of course, further proceedings will be necessary to determine damages.  *See B.S.*, 704 F.3d at 275 (instructing that "County is liable under § 1983 for whatever damages a jury may deem appropriate to redress that violation").

In accordance with the foregoing, summary judgment will be granted in favor of Bower and against LCCYS on Count I.

C.  Jameson and LCCYS (Count II - Constitutional Conspiracy)

In Count II, Bower asserts a constitutional conspiracy/joint participation claim against Jameson and LCCYS.  To establish a constitutional conspiracy claim, Plaintiff must prove:  (1) a

18

conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of

persons of the equal protection of the laws, or of equal privileges and immunities under the laws;

and (3) an act in furtherance of this conspiracy; (4) whereby a person is either injured in his

person or property or deprived of any right or privilege of a citizen of the United States.

*Carpenters v. Scott*, 463 U.S. 825, 828–29 (1983).  In *Lugar v. Edmondson Oil Co*., the Supreme

Court stated: "Private persons, jointly engaged with state officials in the prohibited action, are

acting 'under color' of law for purposes of the statute.  To act 'under color' of law does not

require that the accused be an officer of the State. It is enough that he is a willful participant in

joint activity with the State or its agents."  457 U.S. 922, 941 (1982).

Defendants recognize that, under some circumstances, a private entity such as Jameson

may be deemed a "state actor."  However, LCCYS and Jameson contend that there is no

evidence of willful participation, mutual understanding or joint activity to violate Bower's rights.

Jameson concedes that it reported the test results, but argues that it did not participate in any way

with the decision of how those results would be used by LCCYS.

The Court agrees with Defendants.  As explained in *Mort*, the basic question is whether

the challenged act can be "fairly attributed to the state."  2011 WL 3862641 at * 14 (citations

omitted).  It is true that the interaction between the Jameson policy and the LCCYS policy led to

Baby Brandon being taken into custody and that a more extensive investigation by either

Jameson or LCCYS might have prevented the harm in this case.  Nevertheless, the evidentiary

record does not reflect any joint participation between Jameson and LCCYS.

The actions taken by Defendants in this case occurred separately and independently.  The

Jameson policy of reporting all positive drug test results was developed by Jameson personnel.

The LCCYS policy of seeking ex parte orders was developed by LCCYS personnel.  Jameson

had no role in the LCCYS investigation (or lack thereof) regarding potential child abuse by Bower.  Nor did Jameson participate in the obtaining of a custody order from the court by LCCYS.  Likewise, LCCYS had no role in the initial drug testing or reporting by Jameson.  The hospital and LCCYS performed separate tasks at different times.

Plaintiff, at most, shows that LCCYS and Jameson had a "good business relationship" and various interactions between employees of LCCYS and Jameson on unrelated matters. Plaintiff must show joint participation in the conduct which caused her constitutional injury.  *See Max v. Republican Committee of Lancaster County*, 587 F.3d 198, 203 (3d Cir. 2009) (obtaining information "is not the same as conspiring to violate" constitutional rights); *Kost v. Kozakiewicz*, 1 F.3d 176, 185 (3d Cir. 1993) (granting summary judgment due to failure of  proof that parties reached an understanding to deny constitutional rights).  Regarding Bower, Lightel had only a couple brief informational phone calls with Smolnik.  That is not enough.  Indeed, after reporting the initial positive drug screen, Jameson personnel appeared to oppose LCCYS decision to take Baby Brandon into custody.  There is no evidence of a constitutional conspiracy.

Accordingly, Defendants are entitled to summary judgment on Count II.


D.      Jameson Hospital  (Count III – Negligence)

In Count III, Bower alleges that Jameson acted negligently.  Jameson contends that it is immune from tort liability[12] under the Child Protective Services Law ("CPSL").  In essence, Jameson claims immunity based on its "good faith" report of suspected child abuse to LCCYS. Plaintiff contends that Jameson's "good faith" is a disputed question of fact, because Jameson did not have "reasonable" cause to suspect child abuse.

---

[12] State law cannot provide immunity from an alleged violation of the United States Constitution.  *Caswell v. BJ's Wholesale Co.*, 5 F.Supp.2d 312, 318 (E.D. Pa. 1998).

The Court concludes that Jameson is immune from liability for its report of suspected child abuse. The CPSL, 23 P.S. § 6318, states, in relevant part (emphasis added):

(a) General rule.--A person, hospital . . . that participates **in good faith** in the making of a report, whether required or not, cooperating with an investigation, . . . and **any official or employee of a county agency who refers a report of suspected abuse to law enforcement authorities** or provides services under this chapter, **shall have immunity** from civil and criminal liability that might otherwise result by reason of those actions.

Section 6318(b) states that for the purpose of any civil proceeding, the "good faith of a person required to report pursuant to section 6311. . . shall be presumed." Section 6311, in turn, imposes a reporting duty upon medical professionals, including hospitals, who have "reasonable cause to suspect" child abuse. *Heinrich v. Conemaugh Valley Memorial Hosp.*, 648 A.2d 53, 58-60 (Pa. Super. 1994). Section 6386 reflects: "Health care providers who are involved in the delivery or care of an infant who is born and identified as being affected by illegal substance abuse or as having withdrawal symptoms resulting from prenatal drug exposure shall immediately cause a report to be made to the appropriate county agency. The county agency shall provide or arrange for appropriate services for the infant." Section 6319 provides criminal penalties for failing to comply with the reporting obligation.

"Good faith" must be measured objectively. *Jones v. Snyder*, 714 A.2d 453, 456 (Pa. Super. 1998). Even assuming that Bower had ingested poppy seeds, the undisputed fact remains that she did test positive for morphine. A newborn baby would likely be affected by a mother's apparent illegal substance abuse. Thus, Jameson had reasonable cause to report the test result to LCCYS, particularly in light of the potential penalties in the CPSL for failing to report such information. Jameson had no involvement in the subsequent decision of LCCYS to take custody of Baby Brandon without performing a followup investigation. Plaintiff has failed to overcome the statutory presumption of "good faith" by Jameson. *See Heinrich*, 648 A.2d at 58-60 (parents

failed to overcome presumption of good faith by hospital in reporting suspected child abuse of infant).[13]

In accordance with the foregoing, Jameson is entitled to summary judgment on Count III.


Conclusion

For the reasons set forth above, Lightel and Jameson are entitled to summary judgment and will be dismissed as parties.  LCCYS is entitled to summary judgment on Count II.  However, Bower is entitled to summary judgment against LCCYS on Count I (substantive due process) and the issue of damages will be submitted to a jury.

An appropriate Order follows.


McVerry, J.

---

[13] Jameson also contends that Plaintiff was required to file a certificate of merit and provide an expert opinion as to how the hospital policy breached the standard of care.  Plaintiff contends that the negligence claim in this case does not sound in medical malpractice, and therefore, no certificate of merit or expert opinion is necessary.  The parties also disagree as to whether Jameson's policy was reasonable.  The Court does not reach these issues.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EILEEN A. BOWER,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **2:11-cv-931** |
| **LAWRENCE COUNTY CHILDREN AND** | ) |
| **YOUTH SERVICES, EVA LIGHTEL** | ) |
| *Lawrence County Children and Youth Services* | ) |
| *Caseworker, AND*  **JAMESON HEALTH** | ) |
| **SYSTEMS**, | ) |
| **Defendants.** | ) |

**ORDER OF COURT**

AND NOW, this 12th day of August 2013, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that:

(1) the MOTION FOR SUMMARY JUDGMENT (ECF No. 41) filed by Defendant

Jameson Health Systems is **GRANTED** and Jameson is dismissed as a party;

(2) the MOTION FOR SUMMARY JUDGMENT (ECF No. 46) filed by Defendants

Lawrence County Children and Youth Services ("LCCYS") and caseworker Eva

Lightel is **GRANTED IN PART AND DENIED IN PART**, as follows: LCCYS is

granted summary judgment on Count II of the complaint only;  Lightel is granted

summary judgment on Count I of the complaint and is dismissed as a party;

(3) Plaintiff is **GRANTED** summary judgment against LCCYS on Count I (substantive

due process) of the complaint;

(4) the issue of Plaintiff's entitlement to damages on Count I will be submitted to a jury.

On or before August 26, 2013, Plaintiff shall file her Pretrial Narrative Statement.  On or

before September 9, 2013, LCCYS shall file its Pretrial Narrative Statement. The Court will

conduct a pretrial conference on **Friday, September 13, 2013 at 10:15 a.m.** in Courtroom 6C,

United State Courthouse, 700 Grant Street, Pittsburgh, PA 15219.


      The caption is hereby amended as follows:


| | |
|---|---|
| **EILEEN A. BOWER,** | ) |
|             **Plaintiff,** | ) |
| | ) |
| | )   **2:11-cv-931** |
|       **v** | ) |
| **LAWRENCE COUNTY CHILDREN AND** | ) |
| **YOUTH SERVICES,** | ) |
|           **Defendant.** | ) |
| | ) |


                                      BY THE COURT:

                                      s/Terrence F. McVerry
                                      United States District Judge


cc:    **Stanley T. Booker, Esquire**
        Email: stb233@yahoo.com

        **Marie Millie Jones, Esquire**
        Email: mjones@jonespassodelis.com
        **John C. Conti, Esquire**
        Email: jconti@dmclaw.com
        **Richard J. Kabbert**
        Email: rkabbert@dmclaw.com